RENDERED: MARCH 1, 2024; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2022-CA-0837-MR

RUSSELL COLEMAN, IN HIS
OFFICIAL CAPACITY AS
ATTORNEY GENERAL OF THE
COMMONWEALTH OF KENTUCKY;
MICHAEL G. ADAMS, IN HIS
OFFICIAL CAPACITY AS
SECRETARY OF STATE OF THE
COMMONWEALTH OF KENTUCKY;
MARK METCALF, IN HIS OFFICIAL
CAPACITY AS KENTUCKY
STATE TREASURER; AND
ALLISON BALL, IN HER OFFICIAL
CAPACITY AS STATE AUDITOR
OF PUBLIC ACCOUNTS                                                    APPELLANTS


|       | APPEAL FROM JEFFERSON CIRCUIT COURT |
|-------|-------------------------------------|
| v.    | HONORABLE A. C. MCKAY CHAUVIN, JUDGE |
|       | ACTION NO. 22-CI-002228             |


ANDY BESHEAR, IN HIS
OFFICIAL CAPACITY AS
GOVERNOR OF THE
COMMONWEALTH OF KENTUCKY;
EXECUTIVE BRANCH ETHICS
COMMISSION;
DAVID KAREM, IN HIS OFFICIAL
CAPACITY AS A MEMBER OF

THE EXECUTIVE BRANCH
ETHICS COMMISSION;
JONATHAN SHELL, IN HIS
OFFICIAL CAPACITY AS
COMMISSIONER OF THE
DEPARTMENT OF AGRICULTURE; AND
LEGISLATIVE RESEARCH COMMISSION      APPELLEES

AND

NO. 2022-CA-0838-MR

JONATHAN SHELL, IN HIS
OFFICIAL CAPACITY AS
COMMISSIONER OF THE
DEPARTMENT OF AGRICULTURE      APPELLANT

APPEAL FROM JEFFERSON CIRCUIT COURT
v.   HONORABLE A. C. MCKAY CHAUVIN, JUDGE
ACTION NO. 22-CI-002228

ANDY BESHEAR, IN HIS
OFFICIAL CAPACITY AS
GOVERNOR OF THE
COMMONWEALTH OF KENTUCKY;
DAVID KAREM, IN HIS OFFICIAL
CAPACITY AS A MEMBER OF THE
EXECUTIVE BRANCH ETHICS
COMMISSION;
LEGISLATIVE RESEARCH
COMMISSION;
ALLISON BALL, IN HER OFFICIAL
CAPACITY AS STATE AUDITOR
OF PUBLIC ACCOUNTS;
MICHAEL G. ADAMS, IN HIS
OFFICIAL CAPACITY AS

SECRETARY OF STATE;
COMMONWEALTH OF KENTUCKY
EX REL. ATTORNEY GENERAL
RUSSELL COLEMAN; AND
EXECUTIVE BRANCH ETHICS
COMMISSION                                          APPELLEES

AND

NO. 2022-CA-0991-MR

LEGISLATIVE RESEARCH COMMISSION                     APPELLANT

                    APPEAL FROM JEFFERSON CIRCUIT COURT
v.                  HONORABLE A. C. MCKAY CHAUVIN, JUDGE
                         ACTION NO. 22-CI-002228

ANDY BESHEAR, IN HIS
OFFICIAL CAPACITY AS
GOVERNOR OF THE
COMMONWEALTH OF KENTUCKY; AND
DAVID KAREM, IN HIS
OFFICIAL CAPACITY AS A
MEMBER OF THE EXECUTIVE
BRANCH ETHICS COMMISSION                            APPELLEES

OPINION AND ORDER
REVERSING AND REMANDING IN ALL APPEALS;
DENYING THE GOVERNOR'S MOTION TO DISMISS
IN NO. 2022-CA-0991-MR;
AND DENYING THE ATTORNEY GENERAL'S
MOTION FOR LEAVE TO FILE AN AMICUS BRIEF
IN NO. 2022-CA-0991-MR

** ** ** ** **

BEFORE: COMBS, ECKERLE, AND JONES, JUDGES.

ECKERLE, JUDGE: The broad question before us is whether the General Assembly has the Constitutional authority to distribute among the Governor and the elected Constitutional Officers appointive and removal powers over inferior state officers and members of executive branch boards and commissions? The short answer is yes.

Our affirmative answer to that question then requires we further analyze whether a certain distribution is a legislative overreach in violation of Sections 27, 28, 69, and/or 81 of the Kentucky Constitution because the Governor does not possess the power to appoint the majority of members or to remove any member for cause. Pursuant to the analysis below, we ultimately find the complained-of House Bill contains no violation of the aforementioned Sections.

## BACKGROUND

This case involves the General Assembly's reorganization of the membership board of an inferior state office, the Executive Branch Ethics Commission ("EBEC"), that exists to investigate potential ethical violations of the Executive Ethics Code ("Code") within the Executive Branch. Both the EBEC and the Code were codified in 1992 when KRS[1] 11A.001 *et seq.* was enacted. The Code, and a later-adopted, similar code for the Legislative branch, were born from

---

[1] Kentucky Revised Statutes.

the Commonwealth's interest "to eliminate the apparent/actual corruption from the political system." *Associated Industries of Kentucky v. Commonwealth*, 912 S.W.2d 947, 950 (Ky. 1995). The Code outlines the policy reasons for its existence:

(1) It is the public policy of this Commonwealth that a public servant shall work for the benefit of the people of the Commonwealth. The principles of ethical behavior contained in this chapter recognize that public office is a public trust and that the proper operation of democratic government requires that:

(a) A public servant be independent and impartial;

(b) Government policy and decisions be made through the established processes of government;

(c) A public servant not use public office to obtain private benefits; and

(d) The public has confidence in the integrity of its government and public servants.

(2) The principles of ethical behavior for public servants shall recognize that:

(a) Those who hold positions of public trust, and members of their families, also have certain business and financial interests;

(b) Those in government service are often involved in policy decisions that pose a potential conflict with some personal financial interest; and

(c) Standards of ethical conduct for the executive branch of state government are needed to determine those conflicts of interest which are

> substantial and material or which, by the nature of the conflict of interest, tend to bring public servants into disrepute.

KRS 11A.005.

As the EBEC describes itself in its brief, it "is an independent agency of the Commonwealth which has been given the responsibility of administering and enforcing the provisions of the Code of Ethics." EBEC's Appellee's Brief, p. 2. To perform its functions, the EBEC is authorized to "employ an executive director and any other employees, agents, and consultants it considers necessary[.]" KRS 11A.070. It may engage outside counsel and "make use of the services and facilities of the office of the Attorney General or of any other state agency." *Id*. The EBEC "is granted statutory authority to enforce provisions of the [Code.]" *Kentucky Executive Branch Ethics Comm'n v. Atkinson*, 339 S.W.3d 472, 474 (Ky. App. 2010). The Code, with limited exceptions, applies to all "public servants," which is a broadly-defined term including the Governor, all Constitutional Officers elected pursuant to Section 91 of the Kentucky Constitution ("Constitutional Officers"), all employees in the executive branch, all officers in the executive branch, merit employees in the executive branch, and certain government contractors. KRS 11A.010(9); KRS 11A.040.

Pursuant to the Code, "KRS 11A.080 mandates that the [EBEC] shall investigate any alleged violation of KRS Chapter 11A." *Atkinson*, 339 S.W.3d at

474.  The EBEC maintains subpoena power to carry out its investigations.  KRS 11A.090.  It may hold administrative hearings pursuant to the provisions of KRS Chapter 13B and issue orders of reprimand, cease-and-desist orders, orders for removal or suspension from office or employment, or issue civil penalties of not more than $5,000, should those hearings show clear and convincing proof of a violation of KRS Chapter 11A.  KRS 11A.100; *Turbyfill v. Executive Branch Ethics Comm'n*, 303 S.W.3d 124, 129-30 (Ky. App. 2009).

Importantly, though, the EBEC has no authority to pursue criminal prosecutions.  "The EBEC is not empowered to impose any criminal sanctions, leaving any criminal penalties to be pursued by the Office of the Attorney General."  *Turbyfill*, 303 S.W.3d at 129.  *See also* KRS 11A.100(5) ("The commission shall refer to the Attorney General evidence of violations of KRS 11A.040 for prosecution.  The Attorney General shall have responsibility for all prosecutions under the law and may request from the commission all evidence collected in its investigation . . . .").

When first enacted, the EBEC's board was composed of five members, all appointed by the Governor to serve staggered, four-year terms.  KRS 11A.060.  The Governor also had the power to remove any of the members for cause.  *Id*.  The statute was amended four times over the years.  One of those changes involved detaching the EBEC from the office of the Governor and

attaching it to the Finance and Administration Cabinet for administrative purposes. KRS 11A.060(10). Two other changes were minor and not relevant to the instant challenge.

The latest change, and the subject of the instant constitutional challenge, occurred via House Bill 334 of the 2022 Regular Session of the General Assembly ("HB 334").[2] The contents of HB 334, among other actions, terminated the unexpired terms of the current members and changed the composition of the EBEC's board such that it would now consist of seven total members. The Governor would appoint two of the members, the Lieutenant Governor would appoint zero members, and the Secretary of State, Attorney General, Treasurer, Commissioner of Agriculture, and Auditor of Public Accounts would each appoint a member. HB 334 included some shorter terms of certain initial members so that members of the EBEC would ultimately have staggered, four-year terms. Additionally, the removal-for-cause provision was amended such that only the "appointing authority who appointed" the particular member had the power to remove him or her for cause. KRS 11A.060(7). A subsection was also added prohibiting reorganization of the EBEC "except by statute." KRS 11A.060(11).

Believing HB 334 violated multiple provisions of the Kentucky Constitution, the Governor filed a declaratory judgment action in Jefferson Circuit

---

[2] 2022 Ky. Acts ch. 203 (eff. Jul. 14, 2022).

-8-

Court.  The respective parties each filed motions that could be dispositive of the

underlying claims.  The Trial Court then granted summary judgment in favor of the

Governor and denied the other parties' motions.  The Trial Court found HB 334

violated Sections 27, 28, 69, and 81 of the Kentucky Constitution:

> The Governor is vested with "supreme executive power of the Commonwealth" under Section 69[] of the Kentucky Constitution.  While presumably all branches of government have a shared interest, in keeping with Sections [sic] 81[] of the Kentucky Constitution, the Governor is the constitutional officer charged with the duty to take care (i.e. ensure) that the laws of Kentucky are faithfully executed.  As such, and although the Legislature has the prerogative to withhold executive power from the Governor by assigning them to other constitutional officers, it cannot do so where the reassignment effectively creates another executive officer who will not be subject to the Governor's supremacy or otherwise interferes with the Governor's Constitutional duty/mandate to take care that the laws are faithfully executed.  See *Brown v. Barkley*, 628 S.W.2d 616, 622 (Ky. 1982); *Legislative Research Commission by Prather v. Brown*, 664 S.W.2d 907, 913 (Ky. 1984).  The Court finds such to be the case in the instant case.
>
> In order to carry out the constitutional duty to take care that the laws of Kentucky are faithfully executed, a Governor must have sufficient control over the mechanisms through which that responsibility is effected.  The Commission, as would be the case with any board or commission that is primarily administrative or executive in character, is just such a mechanism.  A Governor's ability to do so depends on his or her ability to appoint the commissioners, supervise their day-to-day activities and, where appropriate, remove them.  HB-334 so severely divests, diminishes, and diverts the current Governor's ability to do so that it functionally,

practically, and effectively prohibits him from ensuring (i.e. "taking care") that the Executive Branch Code of Ethics (i.e. "the law") is faithfully executed and cedes that authority and control to constitutional officers who are not charged with that same constitutional duty. In so doing, it improperly impedes his supreme executive authority as Chief Magistrate and, functionally, practically, and effectively creates a superior executive body (i.e. one over which the Governor has no control). As such, HB-334 is unconstitutional.

Opinion and Order, pp. 3-5. The Trial Court permanently enjoined HB 334 from taking effect. One Constitutional Officer filed a notice of appeal before the other Constitutional Officers filed their combined notice of appeal. Their appeals have been consolidated for briefing purposes. The Trial Court also denied a motion to dismiss filed by the Legislative Research Commission ("LRC"). The LRC timely appealed. Separate briefing occurred, and two motions were filed in that case.[3]

## ANALYSIS

### I.     LRC Appeal No. 2022-CA-0991-MR

We first address the LRC's appeal. The Governor named the LRC as a party to the underlying declaratory judgment action challenging the constitutionality of HB 334. The LRC, alleging legislative immunity, moved to

---

[3] Two outstanding motions exist in this case as well. First, the Governor has filed a motion to dismiss the case. Second, the Attorney General moved for leave to file an *amicus* brief. We deny both motions for the reasons stated *infra*.

-10-

dismiss the claims against it. The Trial Court denied the motion, and the LRC appealed.

In light of *Stivers v. Beshear*, 659 S.W.3d 313 (Ky. 2022), which became final after the filing of LRC's Appellant's Brief in our Court, the LRC should have been dismissed by the Trial Court, as the LRC was entitled to immunity from suit. The Governor now concedes the LRC is entitled to legislative immunity, but argues the proper remedy is to dismiss the LRC appeal as moot. The Governor filed a separate motion to dismiss the instant appeal, and the motion was passed to this panel for a ruling. The LRC argues that dismissal for mootness is not the proper remedy; instead, the LRC prays that we reverse and remand the instant appeal with directions to the Trial Court to dismiss the LRC with prejudice. We agree with the LRC.

This case is on all fours with *Stivers*, and its outcome for the LRC should be no different. There, legislation was being challenged through a declaratory judgment action, and the LRC appealed the denial of a motion to dismiss. Finding the LRC was entitled to legislative immunity under Section 43 of the Kentucky Constitution, the Kentucky Supreme Court reversed and remanded the denial of the motion to dismiss. Specifically, the Supreme Court remanded "with instruction to dismiss all claims against . . . the LRC with prejudice." *Id.* at 326.

-11-

Such is the proper remedy here. If we were to simply dismiss the appeal as the Governor suggests, the LRC would still be a party to the underlying declaratory judgment action as the Trial Court's order denying the motion to dismiss the LRC would still be in effect. The LRC would still be a party unless and until it is dismissed from the case. Because the LRC would remain a party when it should be immune from suit and dismissed with prejudice, the case is not moot because there has not been "a change in circumstance [that] renders th[e] court unable to grant meaningful relief to either party." *Medical Vision Group, P.S.C. v. Philpot*, 261 S.W.3d 485, 491 (Ky. 2008). We can – and must – grant meaningful relief to the LRC and reverse and remand for entry of an order dismissing all claims against the LRC with prejudice. Accordingly, we deny the Governor's motion to dismiss the appeal. We also deny the Attorney General's motion to file an *amicus* brief, as all parties agree that *Stivers* is controlling; thus, no additional exposition on legislative immunity is necessary for this appeal's disposition.

## II.     Constitutional Officers' Appeal Nos. 2022-CA-0837-MR and 2022-CA-0838-MR

At the heart of these appeals is a legislative act that takes away some appointive and removal power from the Governor and disburses those powers to other elected executive officers. Resolving whether this legislative act is

constitutional requires us, the judicial branch, to consider the claims without assigning a value, positive or negative, to the legislation itself or the politics underlying the same. *Johnson v. Commonwealth ex rel. Meredith*, 291 Ky. 829, 165 S.W.2d 820, 823 (1942) ("[I]t is a principle, basic in its recognition and fundamental to the co-ordination of the two divisions of governmental power, that the courts do not concern themselves with the wisdom, need or appropriateness of legislation, nor the purposes motivating it."). *See also City of Lebanon v. Goodin*, 436 S.W.3d 505, 516 (Ky. 2014) ("It would be equally unwise for the Court to endeavor to discern the motivations of a particular legislator or legislative body in making a policy decision or enacting legislation."). Accordingly, the bare question before us is whether HB 334 violates any or all of four Sections of our Constitution – Sections 27, 28, 69, and 81. We begin our analysis with two of those Sections.

**A. Does HB 334 violate Sections 69 and 81 of the Kentucky Constitution?**

The Governor argues that HB 334 violates Sections 69 and 81 of the Kentucky Constitution. Those Sections read, respectively:

> The supreme executive power of the Commonwealth
> shall be vested in a Chief Magistrate, who shall be styled
> the "Governor of the Commonwealth of Kentucky."

and

> He [the Governor] shall take care that the laws be
> faithfully executed.

-13-

The Governor claims that HB 334 violates the "supreme executive power" and the "take care" clauses of these two Sections. Pursuant to these clauses, the Governor argues that his duties as the supreme executive who must take care that the laws are faithfully executed require that he have appointive power for the majority of EBEC's board members and removal-for-cause power over all its board members. Specifically, the Governor states:

> With only two appointments to the seven-member commission, the Governor is unable to ensure the Commission will enforce the Code. As a minority, his appointments cannot ensure the Commission adopts appropriate regulations, carries out necessary investigations or properly disciplines executive branch employees for Code violations. The Commission could launch meritless politically-motivated investigations and make findings and impose civil penalties in those matters. The Governor would have no power to remedy such conduct and ensure the law is faithfully executed. The Governor would also be unable to remove members of the new Commission that he does not appoint, even for cause. If the Governor cannot appoint the majority of members of the commission and remove them for cause, he cannot ensure that the laws are faithfully executed.
>
> . . .
>
> Furthermore, HB 334 would dilute the Governor's ability to take care that the laws are faithfully executed in favor of the other constitutional officers. While the General Assembly may diffuse power among other constitutional officers, it cannot subvert the Governor's supreme executive power in favor of those officers.

Appellee's Brief at 10-11.

-14-

One of the Governor's principal arguments is that his take-care duties under Section 81 of the Kentucky Constitution are akin to the "Take-Care" duties of the President of the United State under Article II, Section 3 of the United States Constitution. We initially note that there was a brief exposition about the limits of the take-care clause during the Kentucky constitutional debates. When discussing what was then numbered Section 14, but with identical text to our current Section 81, the delegates conducted a brief exchange:

> Mr. C.T. ALLEN. I would like to ask some information of the Chairman with reference to the meaning of that. Unless there is some power given to the Governor to enable him to compel officers to do their duty, it is utterly meaningless to me.
>
> Mr. DeHAVEN. In answer to the interrogatory put by the Delegate from Caldwell, I would say that is the identical provision, if my recollection serves me right, that is in the Constitution of the United States and the Constitution of this State. I apprehend that that means that all the executive power within which the Governor is vested shall be exercised whenever an emergency arises making it necessary to execute the law.
>
> Mr. C.T. ALLEN. Suppose a Sheriff in a county of this State were to refuse to do what the Governor directed him to do, or requested him to do, what would be the remedy?
>
> Mr. DeHAVEN. I do not know that the Governor has any right to direct a Sheriff to do any thing.
>
> A vote being taken, the section was adopted.

Vol. I, OFFICIAL REPORT OF THE PROCEEDINGS AND DEBATES IN THE CONVENTION, 1051 (1890).[4]

From this brief debate we can conclude little of substance, save for the fact that the clause is similar to the Federal Take-Care Clause and the delegates expected limits on the office of the Governor. But while there are similarities in terms between the Take-Care Clause in the Federal Constitution and the take-care duty in the Kentucky Constitution, the structural difference of the Kentucky executive branch highlights the limits on the Governor's power and necessarily hinders drawing parallels to the President's power.

First, the accountability structure between our Governor and the President is wholly disparate. In the Federal context "[t]he entire 'executive Power' belongs to the President alone." *Seila Law LLC v. Consumer Financial Protection Bureau*, 591 U.S. ____, 140 S. Ct. 2183, 2197, 207 L. Ed. 2d 494 (2020). In Kentucky, though, the executive power is not so singularly held. The framers of our Constitution saw fit to create an executive branch consisting of multiple, elected, independent executive officers that "provide convenient receptacles for the diffusion of executive power." *Brown v. Barkley*, 628 S.W.2d 616, 622 (Ky. 1982). This diffusion of executive power occurs because the General Assembly may grant "such powers and responsibilities" to the

---

[4] Hereinafter the Debates will be cited as "Vol #, Debates, Page #."

Constitutional Officers through duly-enacted legislation.[5]  *Id*. at 621-22

("Whatever, therefore, the Commissioner of Agriculture may have in the way of

functions, authority, funds or personnel can be removed to another agency at the

will of the General Assembly.").

This structural difference is significant.  Under Kentucky's executive

system, the citizenry elects multiple elected executive officials who have duties

prescribed by the General Assembly and Kentucky's Constitution.  Each elected

executive official is in turn held accountable by the electorate for his or her

respective decisions and actions.  In contrast, the Federal executive branch is a

much narrower focus and magnified in a singular entity, the President, who, given

the immensity of the job, necessarily must appoint, oversee, and control lesser

officials to help the President carry out all federal executive powers across the

entire United States.  *See, e.g.*, *Seila Law*, 591 U.S. ____, 140 S. Ct. at 2197.

To take care that the Federal laws are faithfully executed by the lesser

officials, the President must have the power of appointment of certain executive

officers.  The President's power also includes the ability to remove certain

executive officials, "for it is 'only the authority that can remove' such officials that

they 'must fear and, in the performance of [their] functions, obey.'"  *Id*. (citation

---

[5] Two exceptions exist:  the Attorney General possesses certain powers that existed at common law, and the Secretary of State has certain clerical duties.  *Barkley*, 628 S.W.2d at 621.

-17-

omitted) (alteration in original).  That power is not omnipotent, though, as Congress may impose some removal restrictions depending on the character of the office.  *Id.*  Additionally, granting the President both power to appoint and remove allows the voting public to hold him or her accountable, because "'[w]ithout such power [to remove appointees], the President could not be held fully accountable for discharging his own responsibilities; the buck would stop somewhere else.'"  *Id.*, 591 U.S. ____, 140 S. Ct. at 2191 (quoting *Free Enterprise Fund v. Public Company Accounting Oversight Bd.*, 561 U.S. 477, 541, 130 S. Ct. 3138, 177 L. Ed. 2d 706 (2010)).

Comparing the Governor and the President, then, results in a stark contrast.  Whereas the Federal executive places all "political accountability" in a singular elected official, providing a "'single object for the jealousy and watchfulness of the people[,]'" *Seila Law*, 591 U.S. at ____, 140 S. Ct. at 2203 (citation omitted), the Kentucky Constitution creates multiple elected executive officers, explicitly reserving some powers to the Governor, *see, e.g.*, Sections 75-80, and otherwise permitting the General Assembly to disburse executive power to the other elected officers, *see Barkley*, 628 S.W.2d at 622 ("independent executive offices provide convenient receptacles for the diffusion of executive power").

Second, and as a result of the diffused accountability structure, the corresponding power of removal is different.  For example, over certain officials

-18-

the President has a "power of removal" that "is incident to the power of appointment[.]" *Myers v. United States*, 272 U.S. 52, 122, 47 S. Ct. 21, 27, 71 L. Ed. 160 (1926).  In situations where the "grant of the executive power is enforced by the express mandate to take care that the laws be faithfully executed, it emphasizes the necessity for including within the executive power as conferred the exclusive power of removal." *Id.*

In Kentucky, however, no power of removal is constitutionally incident to any appointive powers the Governor possesses.  *Johnson v. Laffoon*, 257 Ky. 156, 77 S.W.2d 345, 348 (1934) (citing *McChesney v. Sampson, Governor*, 232 Ky. 395, 23 S.W.2d 584 (1930)).  *See also* KRS 63.080, and *Beauchamp v. Rahm*, 283 Ky. 50, 140 S.W.2d 633, 636 (1940) (citing *Page v. Hardin*, 8 B. Mon. 648, 47 Ky. 648 (1848)) ("[T]he power to appoint d[oes] not embody the power to remove.").

The reasons for the President's having some removal power under the Take-Care clause further highlights the President's superior position.  In the Federal context, administrative appointments come in different varieties depending on "the character of their service as prescribed in the law under which they act." *Myers*, 272 U.S. at 132, 47 S. Ct. at 30.  "The highest and most important duties which [the President's] subordinates perform are those in which they act for [the President]." *Id.*  These appointments are "political" and act as "the President's

-19-

alter ego in the matters of that department where the President is required by law to exercise authority[,]" *id.* at 132-33, 41 S. Ct. at 30, for example, when such officers are acting to protect the public domain or to operate quasi-civil foreign governments under the President's direction as commander-in-chief, *id.* at 134, 41 S. Ct. at 31. "In all such cases, the discretion to be exercised is that of the President in determining the national public interest and in directing the action to be taken by his executive subordinates to protect it." *Id.*

The President places his "implicit faith" in such members of "his official family" to act and do his will. *Id.* "The moment that he loses confidence in the intelligence, ability, judgment, or loyalty of any one of them, he must have the power to remove him without delay." *Id.*

In contrast, Kentucky's inferior officers and members are not so reflective of a single, superior executive officer, and their decisions do not affect the entire national interest. Even in the present case, the EBEC's decision-making is not singularly reflective of the Governor, as the EBEC is statutorily tasked with enforcing the Code for the entire executive branch, including the Governor.

And, as we have already noted, the "power of removal is not incident to the power of appointment" in Kentucky. *Johnson*, 77 S.W.2d at 348. Not only that, but also "the power of removal is not inherent in the Governor." *Id.* (citing *Page v. Hardin*, 8 B. Mon. 648, 47 Ky. 648 (1848)). Nonetheless, the power of

-20-

removal of an executive officer is "an administrative or executive function and not a judicial one[.]" *Holliday v. Fields*, 207 Ky. 462, 269 S.W. 539, 540 (1925) (affirming statute permitting governor to remove peace officers for cause). Thus, the executive removal power should fall into the hands of the Governor or a Constitutional Officer, as the General Assembly "definitely has the prerogative of withholding executive powers from [the Governor] by assigning them to these constitutional officers who are not amenable to his supervision and control." *Barkley*, 628 S.W.2d at 622.

Finally, not all of the Presidential powers derived from the Federal Take-Care clause translate to the Governor's duty to take care of the laws in Kentucky. One such power is the removal power, discussed *infra*. Another is prosecutorial discretion, *see Heckler v. Chaney*, 470 U.S. 821, 832, 105 S. Ct. 1649, 84 L. Ed. 2d 714 (1985), which, in the Federal context, is given to the Attorney General and the United States Attorneys "because they are designated by statute as the President's delegates to help him discharge his constitutional responsibility to 'take Care that the Laws be faithfully executed.'" *United States v. Armstrong*, 517 U.S. 456, 464, 116 S. Ct. 1480, 1486, 134 L. Ed. 2d 687 (1996). In contrast, Kentucky's Attorney General is a separately elected Section 91 Constitutional Officer and not the Governor's statutory delegate. The Attorney General serves as the chief law enforcement officer of Kentucky with resulting

prosecutorial discretion. *See Commonwealth v. Johnson*, 423 S.W.3d 718 (Ky. 2014); KRS 15.020.

Notably, in the instant case, the Code requires any criminal prosecutions be referred to the Attorney General, who would then exercise prosecutorial discretion on pursuing criminal charges. *See* KRS 11A.100(5); *Turbyfill*, 303 S.W.3d at 129.

Beyond the above differences with the Federal government, in Kentucky the "take-care" clause of Section 81 is a source of duty, not a source of power. Indeed, Section 81 does not even require the Governor to implement every law when doing so would require the Governor to perform a legislative action; "the mere existence of a law does not mean that it must be implemented if doing so requires the expenditure of unappropriated funds." *Fletcher v. Commonwealth*, 163 S.W.3d 852, 869 (Ky. 2005). The plain and simple phrase "take care that the laws be faithfully executed" in our Constitution is "*an idle and meaningless phrase*" without some other power lodged in the Governor. *Franks v. Smith*, 142 Ky. 232, 134 S.W. 484, 487 (1911) (emphasis added). As noted by the *Franks* Court:

> The power to call out the state militia was vested in the Governor, the chief executive officer of the state, for the wise and wholesome purpose of enabling him to carry into effect the mandate of the Constitution that he must "take care that the laws be faithfully executed." If this power was not lodged in him, then this provision of the

> Constitution would be an idle and meaningless phrase, because, although charged with the duty of taking care that the laws of the state should be faithfully executed, he would have no authority to enforce the obligation imposed upon him.

*Id.*

So, the question is, does the Governor's status as the supreme executive under Section 69 grant him some power that can couple with the "idle and meaningless phrase" in Section 81 to grant the Governor power to control boards through appointment and removal? We are bound by precedent to answer this question in the negative.

Pursuant to Section 69, the Governor "has only such powers as the Constitution and Statutes, enacted pursuant thereto, vest in him, and those powers must be exercised in the manner and within the limitations therein prescribed." *Royster v. Brock*, 258 Ky. 146, 79 S.W.2d 707, 709 (1935). *See also Barkley*, 628 S.W.2d at 623 ("Practically speaking, except for those conferred upon him specifically by the Constitution, his powers, like those of the executive officers created by Const. Sec. 91, are only what the General Assembly chooses to give him."). The "supreme executive power" provision "only vests the Governor with executive powers, just as Section 29 vests the General Assembly with legislative powers and Section 109 vests the Court of Justice with judicial powers." *Fletcher*, 163 S.W.3d at 869.

History supports this conclusion. Within a few decades of the current Constitution's adoption, our highest Court noted the Governor's office has few inherent powers. For example, "[t]he right to convene the General Assembly in extraordinary session does not inhere in the office of Governor, nor is it a necessary incident of the office." *Royster*, 79 S.W.2d at 709. "[T]he office of governor was 'unknown to common law' and created solely by our state constitution." *Kentucky Employees Retirement System v. Seven Counties Services, Inc.*, 580 S.W.3d 530, 539 (Ky. 2019) (citing *Royster*, *supra*). Pertinent to the current issue of dispersing executive powers, our then-highest Court noted the power to call a special session under Section 80 of the Kentucky Constitution "might have been lodged *in some other state official*, or in the Legislature itself." *Royster*, 79 S.W.2d at 709 (emphasis added). *See also Kentucky Employees Retirement System*, 580 S.W.3d at 539 (holding that construction of a statute as giving the Governor the power to contract with any department for participation in the Kentucky Employees Retirement System "would violate Kentucky law providing that '[t]he Governor has only such powers as are vested in him by the Constitution and the statutes enacted pursuant thereto'") (quoting *Martin v. Chandler*, 318 S.W.2d 40, 44 (Ky. 1958)). *Compare with Guenthner v. Brown*, 671 S.W.2d 260 (Ky. App. 1984) (Governor possesses the authority under Section 80 of the Kentucky Constitution to change or alter the date of an extraordinary

-24-

session of the General Assembly); *Stickler v. Higgins*, 269 Ky. 260, 106 S.W.2d 1008 (1937) (Governor possesses the authority under Section 80 of the Kentucky Constitution to amend, correct, or add to the subjects mentioned in the original proclamation calling for an extraordinary session); *Fletcher*, 163 S.W.3d at 869 (Governor has no inherent power to order appropriations necessary for the executive department to prevent the imminent collapse of government services).

We do acknowledge the Governor has not argued that his power is wholly eminent; the Governor's argument implicitly, if not explicitly, acknowledges the weight of the foregoing jurisprudence. Indeed, the Governor concedes that "the General Assembly may diffuse executive power among other constitutional officers," but argues nonetheless that his executive power must remain supreme per Section 69; meaning, the Governor must have the power to appoint a majority of members and remove any member for cause. The Governor cites to *Brown v. Barkley*, 628 S.W.2d 616 (Ky. 1982), for this proposition. Having thoroughly reviewed *Barkley*, we do not come to the same conclusion.

In *Barkley*, the then-Governor of Kentucky, John Y. Brown, issued an executive order attempting to transfer functions, personnel, and funds from the Department of Agriculture and place them in a newly created Energy and Agriculture Cabinet. The then-Commissioner of Agriculture challenged the validity of the executive order on statutory grounds, and the trial court agreed. The

Governor appealed, claiming both statutory and constitutional authority to cause the transfer and creation of the new cabinet. The Kentucky Supreme Court disagreed, finding neither the statute nor the Constitution permits the Governor such power. *Id*. at 618.

In a thorough discussion of the interrelation of constitutional powers granted to the Governor, the Constitutional Officers, and the General Assembly, the Court noted two overriding principles. First, any unexpressed executive power – whether implied or inherent – is "subservient to the overriding authority of legislature[.]" *Id*. at 621. And second, the Constitutional Officers "have only such powers and duties as are assigned to them by legislative enactment or by executive order expressly authorized by statute." *Id*.

The office of Governor is established as the "supreme executive power of the Commonwealth" in Section 69. *Id*. That office is given seven expressly conferred powers and duties, namely that the Governor: is the commander-in-chief of the military forces (Section 75); may fill vacancies in office except as otherwise stated in the Constitution (Section 76); may grant pardons and reprieves and remit fines and forfeitures (Section 77); may require written information from the Constitutional Officers on subjects relating to their respective offices (Section 78); shall report the state of the Commonwealth to the General Assembly (Section 79); may call a special session of the General Assembly and

-26-

adjourn the General Assembly in certain circumstances (Section 80); and must take care that the laws are faithfully executed (Section 81). *Id.*

Conversely, the Constitutional Officers, which are established pursuant to Sections 91 and 93 of the Kentucky Constitution, have such duties as are prescribed by law, save only that the Attorney General has some powers that existed at common law, and the Secretary of State has some specifically prescribed clerical duties. *Barkley*, 628 S.W.2d at 621-22.

Noting this "naked" authority granted to the Constitutional Officers, the *Barkley* Court asked the question why the Constitutional Officers are elected or even mentioned at all in the Constitution. *Id.* at 622. "The answer, we think, though it may not have been articulated by the framers of the Constitution in their debates, is that these independent executive offices provide *convenient receptacles for the diffusion of executive power*." *Id.* (emphasis added). The Governor's authority as the "supreme executive power" negates the General Assembly's authority "to create another executive officer or officers who will not be subject to that supremacy[.]" *Id.* However, the General Assembly "definitely has the prerogative of withholding executive powers from him by assigning them to these constitutional officers who are not amenable to his supervision and control." *Id.*

*Barkley*'s holding has been reaffirmed in the years since its passage:

> In *Brown v. Barkley*, we held that the Governor could not transfer legislatively-created [*sic*] functions

from one executive agency to another executive agency without legislative authority to do so. Ky., 628 S.W.2d 616, 623 (1982). In so holding, we stated that, if the Governor had the inherent executive power to make the transfers in question, then that inherent power was subordinate to the will of the General Assembly. *Id.* Other cases make clear that the executive power of removal is likewise subordinate to will of the General Assembly. *See, e.g.*, *McChesney v. Sampson*, 232 Ky. 395, 23 S.W.2d 584, 586 (1930) (Governor could not remove his own appointee without statutory authority).

> *Johnson* [*v. Commonwealth ex rel. Meredith*, 291 Ky. 829, 165 S.W.2d 820 (1942)] and *B*[*arkley*] stand for the proposition that the General Assembly may take common-law powers away from executive constitutional officers and assign them to different executive officers or agencies without violating the constitution, which is all that occurred in this case.

*McClure v. Augustus*, 85 S.W.3d 584, 586 (Ky. 2002), *as modified* (Oct. 8, 2002)

(alterations added).

Our Supreme Court recently reaffirmed *Barkley* in a case involving

largely the same instant parties:

> *Barkley* is instructive in this regard, but not as the Governor argues. Under Section 15, the General Assembly might grant the Governor the power to suspend statutes. Or, it properly might grant that power to the Attorney General. *See Barkley*, 628 S.W.2d at 621 (stating "the officers named in [Section] 91 have only such powers and duties as are assigned to them by legislative enactment or by executive order expressly authorized by statute[ ]"). In *Barkley*, we recognized the Constitution framers created these independent, statewide-elected officers to "provide convenient receptacles for the diffusion of executive power." *Id.* at

-28-

622. Given the importance of the power to suspend laws, we see no valid reason why the General Assembly might not properly grant the power to two independently-elected constitutional officers.

The Governor argues that the immediately following sentence in *Barkley* supports his argument that by doing so, the General Assembly has impermissibly "create[d] another executive officer or officers who will not be subject to [the Governor's] supremacy[.]" *Id.* The complete quotation is:

> As the Governor is the "supreme executive power," it is not possible for the General Assembly to create another executive officer or officers who will not be subject to that supremacy, but **it definitely has the prerogative of withholding executive powers from him by assigning them to these constitutional officers who are not amenable to his supervision and control**.

*Cameron v. Beshear*, 628 S.W.3d 61, 76-77 (Ky. 2021) (emphasis in original).

The *Cameron* Court was concerned with the General Assembly's delegation of its Section 15 powers, while the instant case concerns the General Assembly's delegation of power under Section 93. Both Sections permit the General Assembly to decide how powers will be used. *Compare* Section 15 ("No power to suspend laws shall be exercised unless by the General Assembly **or its authority**.") (emphasis added), *with* Section 93 ("Inferior State officers and members of boards and commissions, not specifically provided for in this Constitution, may be appointed or elected, **in such manner as may be prescribed**

-29-

**by law, which may include a requirement of consent by the Senate** . . . .")
(emphasis added). Thus, we do not find a factual or legal distinction that changes
the analysis in the instant case, and we are bound to follow this precedent. *Kindred
Healthcare, Inc. v. Henson*, 481 S.W.3d 825, 829 (Ky. App. 2014).

The weight of authority shows that in the absence of an explicit
statutory or constitutional power that requires the Governor to have majority
appointive power and complete removal power for members of administrative
boards, our Supreme Court has spoken – the General Assembly may "withhold[]"
executive powers from the Governor and "assign[]" them to the remaining
Constitutional Officers. *Cameron*, *supra*, and *Barkley*, *supra*. Neither Section 69
nor 81 grants more to the Governor.

Beyond *Cameron* and *Barkley*, though, we note that *Fox v. Grayson*,
317 S.W.3d 1 (Ky. 2010), contains historical analysis that is pressing on whether
the Governor's power should require that he appoint a majority of members of an
administrative board or membership. The *Fox* Court was tasked with determining
whether non-constitutionally mandated state officers could be confirmed by both
the Senate and the House, rather than just the Senate. *See* Section 93 of the
Kentucky Constitution (stating, in relevant part, "Inferior State officers and
members of boards and commissions, not specifically provided for in this
Constitution, may be appointed or elected, in such manner as may be prescribed by

law, which may include a requirement of consent by the Senate . . . .").  The

Governor in *Fox* noted that "the framers of our 1891 Constitution rejected a

proposed section that would have required all non-constitutionally mandated state

officers to have been confirmed by the Senate."  *Fox*, 317 S.W.3d at 11.  Indeed,

the framers deleted a portion of Section 76, which then read:

> He [the Governor] shall appoint, with the advice and
> consent of the Senate, all State officers who are not
> required by this Constitution, or the laws made
> thereunder, to be elected by the people.

Vol. IV, Debates, 5728.

The Court noted that this language "was originally intended only to

permit the Governor to appoint the state Librarian."  *Fox*, 317 S.W.3d at 12.  The

language was not intended to give the Governor such broad powers of

appointment, as Delegate Charles J. Bronston of Fayette County stated to the

delegates, "It was not understood at that time that the appointing power should be

extended to any other official save that."  IV, Debates, 5728.

The problem noted with this broad language in Section 76 is that it

would have removed from the General Assembly the "flexibility in determining

whether inferior state officers should be elected or appointed."  *Fox*, 317 S.W.3d at

12.  That flexibility is derived from "the more general language of what ultimately

became § 93[.]"  *Id*.  Thus, the deletion of the language in Section 76 was not to

take away confirmation power from the Senate.  Quite the opposite – its removal

was to "give the General Assembly flexibility in determining which inferior state officers must be subjected to confirmation at all." *Id.*

The Court in *Fox* quoted approvingly a portion of Delegate Bronston's comments during the Debates to arrive at the above conclusion. *Id.* We reproduce the entirety of Delegate Bronston's statement here:

> We did not deem that that would be wise, because, if that construction was given, unquestionably it would allow the Governor to appoint, not only the Librarian, but the Commissioner of Insurance and the Reporter of the Court of Appeals, and other subordinate officers, who are paid, by reason of their appointment for service in Frankfort, out of the State Treasury, and it would disturb that settled principle which, we believe, has been approved by the people, that as to all these subordinates, **it should be left to the power of the General Assembly to say whether they should be elected or appointed, and** if not elected by the people, **by whom they should be appointed**.

IV, Debates, 5728 (emphasis added).

It appears, then, that the delegates were cognizant that deleting the language from Section 76 would have at least three results pertinent to this case: (1) the Governor would not by default have the power to appoint all non-constitutional officers or members; (2) the General Assembly would have the power to decide whether each non-constitutional officer or member should be elected or appointed; and (3) the General Assembly would have the power to determine "by whom" the non-elected, non-constitutional officers or members should be appointed.

Indeed, almost a century ago our state's highest Court affirmed an act that reorganized a commission and wholly changed the Governor's appointment power over those members. In *Rouse v. Johnson*, 234 Ky. 473, 28 S.W.2d 745 (1930), the Governor previously appointed all four members of the State Highway Commission. Under a new statute, a new agency was created. The new agency had eight members, not four, and "the power to appoint the eight commissioners provided for by that act was taken away from the Governor and lodged with an 'Appointing Board' therein provided for and to consist of the Governor, Lieutenant Governor and Attorney General." *Id*. at 746.[6] Those members were then confirmed by the Senate.

The Governor challenged the act in part because, he argued, the Lieutenant Governor's office was primarily a legislative one. The Court rejected any separation-of-powers violation under Sections 27 and 28 of the Kentucky Constitution, because "the Lieutenant Governor is a member of the executive branch of government." *Legislative Research Comm'n By and Through Prather v. Brown*, 664 S.W.2d 907, 923 (Ky. 1984) (discussing *Rouse*). "[T]he power of appointment was indeed properly lodged in the commission, a part of the executive branch of government." *Id*.

---

[6] The Lieutenant Governor, at that time, was a separately elected position. *See* 1992 Ky. Acts ch. 168, § 19.

The instant legislation is similar in that the EBEC's board under HB 334 will be composed of members appointed by executive branch officers. The Governor distinguishes *Rouse* by noting that there the Governor remained as one of the three executive branch officers on the "Appointing Board" for all eight of the members, but under HB 334 the Governor only appoints two of the seven members and has no say in the remaining five members. We believe this distinction does not hold, as the Governor actually has more power under HB 334 than the Governor had in *Rouse*. Under HB 334 the Governor decidedly appoints two members with no additional input from any other executive branch officer. In *Rouse*, the Governor was only one of three members of the "Appointing Board," and the Governor could potentially have zero say in which members were appointed if neither the Lieutenant Governor nor the Attorney General agreed with the Governor's choices.

Also, to the extent the Governor in his Appellee's Brief infers that HB 334 violates his Section 76 powers, *Rouse* controls:

> Section 76 of the Constitution confers upon the Governor the power, "except as otherwise provided in this Constitution," to fill vacancies in office, but that section should be read in connection with section 93 of the same instrument, which says in part: "Inferior state officers, not specifically provided for in this Constitution, may be appointed or elected, in such a manner as may be prescribed by law," etc. Evidently that excerpt falls within the inserted exception contained in section 76, and when so considered and the two sections read together it

> would confine the vacancies mentioned in section 76 to such officers as are created by the Constitution, and not to the filling of vacancies in those created by the Legislature under the provisions of the inserted excerpt from section 93.

28 S.W.2d at 751.

The Governor also implies that without his control of the EBEC's board, the EBEC will become an independent, fourth branch of government, which is not permitted. *See, e.g.*, *Brown*, 664 S.W.2d at 917. Respectfully, we do not agree. The EBEC here exists to oversee the entire executive branch, including the Governor and all Constitutional Officers. Its membership under HB 334 is wholly appointed by executive branch officers. In contrast, the LRC in *Brown* was a service agency of the General Assembly, independent of the Governor and the executive branch, and subject to control by the General Assembly. *Id*. While the EBEC does refer to itself as an independent agency, its independence is not of the fourth-branch ilk.

We further address the Governor's argument that the Attorney General made an inconsistent argument in *Cameron v. Ball*, Nos. 2022-CA-1419-MR and 2022-CA-1490-MR, 2023 WL 8286690 (Ky. App. Dec. 1, 2023) (consolidated).[7] Those cases concern acts of the General Assembly that effectively

---

[7] By separate order on a motion filed after the briefing time expired in the instant case, we granted the Governor's motion to cite to the Attorney General's Reply brief in *Cameron v. Ball*.

prohibit the Governor from challenging legislation believed to be unconstitutional by removing the financial means to bring such suits. On December 1, 2023, a Slip Opinion was rendered by a panel of our Court holding that said legislation was unconstitutional. While the Opinion in those cases is not yet final, we have nonetheless reviewed the Attorney General's argument in those cases and find it neither inconsistent nor applicable to the instant case.

Those cases concerned a broad removal of the Governor's power to initiate challenges to legislation that the Governor deemed unconstitutional, with the Attorney General arguing the Governor could, pursuant to Section 81 of the Kentucky Constitution, omit to perform legislation the Governor believed was unconstitutional, thus teeing up a constitutional challenge in Court that the Governor could then expend funds to defend. The Governor notes that in the instant case the Constitutional Officers have argued that Section 81 of the Kentucky Constitution requires the Governor to abide by, *not* omit to follow, enacted legislation.

The Constitutional Officers disagree that there is any inconsistency with these two positions, claiming the Attorney General's position in *Cameron v. Ball* is simply a concession to the state of the law, which allows the Governor to omit performance of a law he legitimately believes is unconstitutional. In the instant case, though, the Constitutional Officers claim the Governor cannot omit

-36-

performance but must follow the instant law because the General Assembly has the authority to determine which executive officer can appoint board members. The Attorney General also notes that in this case the Governor is not seeking to use the Section 81 duty to omit performance, but instead is seeking to "wield[] Section 81 to argue that it empowers him to appoint a majority of the voting members of every board and commission in Kentucky." Response to Motion to Supplement, p. 2.

Both parties are correct as these positions are facially inconsistent and present a challenged nuance – is Section 81 a duty to follow the Constitution, which requires the omission of a legislatively mandated act that is unconstitutional, or is Section 81 a grant of power to follow the Constitution, which permits actions contrary to a legislatively mandated act if the Governor believes the legislation is unconstitutional? Or, perhaps, is it some mixture of both? Or neither? The facial inconsistency at minimum proves our Supreme Court's presaged maxim regarding the tension between our current General Assembly and Governor, namely that "hard cases will exist on the margins." *Stivers v. Beshear*, 659 S.W.3d 313, 325 (Ky. 2022).

In some respects, the inconsistency in position is simply a matter of viewpoint. Consider a driver who happens upon a broken-down car blocking the roadway. The driver knows she has an obligation to drive on the right side of the road, and she can see that a double-yellow line would prohibit passing on the left

-37-

side. If the driver chooses to pass around the vehicle by using the left lane, has she followed a general duty to drive safely and omitted following the double-yellow-line passage rule? Or has she used the duty to drive safely as a power allowing her to bypass the double-yellow-line rule? A reasonable person could entertain both arguments with full credulity. The analogy is incomplete, as all analogies are, but highlights the "inconsistency" here.

Indeed, the Governor's argument in his Motion to Supplement shows that the dual positions may be maintained. The Governor claims that per the inconsistent positions, "the Governor must either blindly abide by unconstitutional laws, which cannot be what Section 81 requires, or ignore the law and apply it as it existed before HB 334 (R.S. 2022), which would create the chaotic situation of two Ethics Commissions existing." Motion to Supplement, 2. These extremes are tantamount to driving through the broken-down car in our analogy and are outside of the executive branch's obligations. As our Supreme Court has stated, the executive branch is not "free to disregard or refuse to enforce statutes that it dislikes by summarily concluding that they are unconstitutional." *Stivers*, 659 S.W.3d at 325. And, also, "where there is a reasonable legal argument that a statute violates the Kentucky Constitution, the executive branch must carefully choose how to ensure that the laws are faithfully executed." *Id*. Here, the

Governor made the reasonable choice to drive around the broken-down car and challenge the law in Court.

We further note that while we have here considered the Attorney General's argument in Nos. 2022-CA-1419-MR and 2022-CA-1490-MR, we do not pass on the merits of those consolidated cases. Instead, we hold that in this case we believe the Constitutional Officers' argument is responsive to the Governor's choice to what he perceived to be unconstitutional legislation, and it is also not inconsistent with its position in *Cameron v. Ball*.

Additionally, obscured by both parties in this tangential argument is that the issue in the instant case is acutely narrower than in *Cameron v. Ball*. Namely, and as it relates to a board that oversees the ethics of all officers and employees of the entire executive branch, our question is this: does the Governor have Constitutional authority to appoint the majority of the EBEC board's members and remove any member for cause? Wrapped up in that question is the additional nuance that the instant legislation is much less restrictive than in *Cameron v. Ball*, as the Governor still retains appointive and removal power over two of its board members.

Moreover, we note that our analysis of the narrow question is with a strong presumption that the statute is constitutional:

> Another rule of interpretation is that we "'presum[e] that the challenged statutes were enacted by the legislature in

-39-

accordance with constitutional requirements.'" [*Beshear v.*] *Acree*, 615 S.W.3d [780,] 805 [(2020)] (quoting *Cornelison v. Commonwealth*, 52 S.W.3d 570, 572 (Ky. 2001)). "A constitutional infringement must be 'clear, complete and unmistakable' in order to render the statute unconstitutional." *Caneyville Volunteer Fire Dep't v. Green's Motorcycle Salvage, Inc.*, 286 S.W.3d 790, 806 (Ky. 2009) (quoting *Ky. Indus. Util. Customers, Inc. v. Ky. Utils. Co.*, 983 S.W.2d 493, 499 (Ky. 1998)). Considering that the General Assembly is the policy-making body for the Commonwealth, not the Governor or the courts, equitable considerations support enforcing a legislative body's policy choices.

*Cameron*, 628 S.W.3d at 73.

Coupling that strong presumption with the history and jurisprudence of Sections 69 and 81, and the narrow legislation before us, we hold that HB 334 does not infringe on constitutionally derived appointive and removal powers, if any, that the Governor possesses. We thus reverse the Trial Court's order on this issue.

## B. Sections 27 and 28 of the Kentucky Constitution.

Next, the Governor argues HB 334 violates Sections 27 and 28 of the Kentucky Constitution. Those Sections read:

> The powers of the government of the Commonwealth of Kentucky shall be divided into three distinct departments, and each of them be confined to a separate body of magistracy, to wit: Those which are legislative, to one; those which are executive, to another; and those which are judicial, to another.

and

-40-

No person or collection of persons, being of one of those departments, shall exercise any power properly belonging to either of the others, except in the instances hereinafter expressly directed or permitted.

Those Sections may be referred to as the separation of powers. *Prater v. Commonwealth*, 82 S.W.3d 898, 901 (Ky. 2002). They have existed in one form or another in each of the Commonwealth's three prior Constitutions and are "designed to separate the powers of government and prevent concentrations of power." *Id.* In other words, they permit each branch of government to operate only within their respective spheres of power. For example, the legislative branch is to "discuss and enact laws, and to do nothing else." *Brown*, 664 S.W.2d at 912 (citation omitted). And "a **constitutional** violation of separation of powers occurs when, and only when, one branch of government exercises power properly belonging to another branch." *Prater*, 82 S.W.3d at 907 (emphasis in original).

Having already found HB 334 does not violate Sections 69 and 81 of the Kentucky Constitution, however, we are left with the stark analysis of whether HB 334 violates the separation of powers by allowing the legislative or judicial branches to act as the executive branch. Here, HB 334 only disburses the appointment and removal powers of the executive branch among other members of the executive branch. HB 334 gives neither the legislative branch nor the judicial branch any say whatsoever in which members are appointed or removed. Thus, there is no violation of the separation of powers because, "while the legislature

-41-

may affect the executive branch's appointments by establishing before-and-after-the-fact parameters for the executive branch's exercise of the power to make appointments, the legislature *cannot itself exercise the executive power of appointment.*" *Prater*, 82 S.W.3d at 909 (emphasis in original). HB 334 operates by establishing the parameters, but it does not allow the legislature to exercise the executive power of appointment. *See Rouse*, *supra*. Thus, HB 334 does not violate Sections 27 and 28 of the Kentucky Constitution.

**C. Section 93 of the Kentucky Constitution**.

Finally, the Constitutional Officers argue that HB 334 is constitutional as a legislative enactment because it was enacted pursuant to Section 93. As we have previously discussed, Section 93 does impose upon the General Assembly the authority to legislate whether inferior state officers and members of boards and commissions are appointed or elected. *See Brown*, 664 S.W.2d 921-23. That authority, however, is restrained by other Sections of the Kentucky Constitution. *See id.* at 923-24. Thus, simply being a Section 93 enactment is not decisive of the instant issues. We have analyzed HB 334 and find no violation of Sections 69, 81, 27, and 28 of the Kentucky Constitution. This case is reversed and remanded for entries of orders consistent with this Opinion and Order.

**CONCLUSION**

Our holdings and orders in the above-styled cases are as follows:

In Nos. 2022-CA-0837-MR and 2022-CA-0838-MR, we REVERSE AND REMAND the Trial Court's Order for entry of an order consistent with this Opinion and Order.

In No. 2022-CA-0991-MR, we REVERSE AND REMAND the Trial Court's Order for entry of an order dismissing the LRC with prejudice.

In No. 2022-CA-0991-MR, we DENY the Governor's motion to dismiss.

And in No. 2022-CA-0991-MR, we DENY the Attorney General's motion for leave to file an *amicus* brief.

JONES, JUDGE, CONCURS.

COMBS, JUDGE, CONCURS AND FILES SEPARATE OPINION.


ENTERED: _March 1, 2024__          _____
                                   JUDGE, COURT OF APPEALS

COMBS, JUDGE, CONCURRING:  Mindful of the mandate of SCR[8] 1.030(8)(a) that we follow the precedent of the Kentucky Supreme Court, I write this concurrence rather than a dissent from the majority Opinion.

It appears that we are inescapably bound by the reasoning and holding of *Brown v. Barkley*, 628 S.W. 2d 616 (Ky. 1982).  Now forty-two years of age, it

---

[8] Kentucky Supreme Court Rules.

has been affirmed numerous times over the years for the proposition that the powers of the chief executive, the Governor, are circumscribed and dictated both by the Constitution and by the *fiat* of the General Assembly. During the oral argument on the case currently before us, counsel for the Attorney General confidently declared that *Brown* amounted essentially to an impenetrable fortress that could not -- and should not -- be re-visited by our Supreme Court.

With that declaration, I respectfully disagree. I would hope that this critically important case involving the very heart of the sacrosanct doctrine of separation of powers will receive a thoughtful and serious review by our Supreme Court. Obviously, many years have passed since Chief Justice Palmore authored *Brown.* Many political winds -- both ill and fair -- have blown over the Commonwealth since 1982. We have recently seen a proliferation of cases, at least four major appeals, within the last eighteen months, involving restraints imposed by the legislature on the exercise of executive powers by the Governor. In some form or other, these cases all constitute an incremental but insistent incursion by the legislative branch into the authority of the executive.

At the heart of the case before is the issue laid out in Section 69 of the Kentucky Constitution: what indeed is the essence of its grant of "the supreme executive power of the Commonwealth" to the Governor? How far can that "supreme executive power" be diluted, dispersed, distributed, or diverted under the

presumed precedent of *Brown*?  How many limitations can be imposed legislatively without vitiating that authority to the point of a practical, *de facto* nullity in violation of Sections 27 and 28 of the same Kentucky Constitution?  A balance among these various sections of the Constitution needs to be sought and judicially defined in order to preserve the guarantee that the spirit as well as the letter of the Constitution will be preserved, protected, and defended.

The recent barrage of litigation on this critical issue convinces me that review by the Supreme Court is indeed both needed and warranted.

BRIEFS FOR LEGISLATIVE
RESEARCH COMMISSION:

Gregory A. Woosley
Frankfort, Kentucky

BRIEFS FOR RUSSELL COLEMAN,
ATTORNEY GENERAL:

Matthew F. Kuhn
Harrison Gray Kilgore
Frankfort, Kentucky

BRIEFS FOR MICHAEL ADAMS,
SECRETARY OF STATE:

Jennifer Scutchfield
Michael R. Wilson
Frankfort, Kentucky

BRIEFS FOR JONATHAN SHELL,
COMMISSIONER OF
AGRICULTURE:

Joseph A. Bilby
Frankfort, Kentucky

BRIEFS FOR MARK METCALF,
TREASURER:

Brittany J. Warford
Frankfort, Kentucky

BRIEFS FOR ALLISON BALL,
AUDITOR:

Graham Gray
Frankfort, Kentucky

BRIEF FOR ANDY BESHEAR,
GOVERNOR:

S. Travis Mayo
Taylor Payne
Frankfort, Kentucky

Mitchel T. Denham
Louisville, Kentucky

BRIEF FOR DAVID KAREM,
MEMBER, EXECUTIVE BRANCH
ETHICS COMMISSION:

Mitchel T. Denham
Louisville, Kentucky

BRIEF FOR EXECUTIVE BRANCH
ETHICS COMMISSION:

Susan Stokley Clary
Frankfort, Kentucky

ORAL ARGUMENT FOR ANDY
BESHEAR, GOVERNOR, AND
DAVID KAREM, MEMBER,
EXECUTIVE BRANCH ETHICS
COMMISSION:

Mitchel T. Denham
Louisville, Kentucky

ORAL ARGUMENT FOR
LEGISLATIVE RESEARCH
COMMISSION:

Gregory A. Woosley
Frankfort, Kentucky

ORAL ARGUMENT FOR RUSSELL
COLEMAN, ATTORNEY
GENERAL:

Matthew F. Kuhn
Frankfort, Kentucky